OGLEBAY NORTON COMPANY, Appellant, v. INDUSTRIAL COMMISSION and others, Respondents.

*November 28, 1961—January 15, 1962.*

For the appellant there was a brief by *Richard H. Hastings* of Duluth, Minnesota, attorney, and *Hughes, Anderson & Davis* of Superior of counsel, and oral argument by *Mr. Hastings*.

For the respondent Industrial Commission there was a brief and oral argument by *Arnold J. Spencer,* chief counsel of the unemployment compensation division.

FAIRCHILD, J.   Sec. 108.05 (4), Stats., prescribes certain conditions which an employer must fulfil before vacation pay may be treated as wages for a particular week.  In the case before us the employer met the statutory conditions.  The question presented is whether the contract prevented the employer from allocating the vacation pay to weeks 47 and 48.  The statute does not give an employer a right to allocate vacation pay to a period he desires if a contract requires him to treat some other period as vacation.[1]

The material facts in the present case are virtually undisputed.  The question must be resolved by determining the reasonable construction of those provisions of the contract which relate to vacation together with the September 12th addendum and by applying the contract and addendum as so construed to the facts.

The appeal tribunal and the commission apparently reasoned, in substance, as follows: The contract was not in effect after July 14th but nevertheless controlled the rights and obligations of the parties not only as to the amount of vacation and vacation pay due the employees, but as to the scheduling of vacation periods.  The employer gave a proper sixty days' notice of its intent to schedule vacations during a shutdown period from July 19th to August 1st, weeks 30

---

[1] *Danielson v. Industrial Comm.* (1958), 4 Wis. (2d) 367, 90 N. W. (2d) 608.

and 31. This notice established the vacation schedules for 1959 (except for those employees specially permitted to take vacation at other periods). The employer did not give a proper sixty days' notice of its intent to schedule vacations during a two-week shutdown period starting November 15th (weeks 47 and 48). Therefore an employee could exercise his option under the contract to be laid off during weeks 47 and 48 and to "take his vacation at the previously scheduled time," *i.e.,* weeks 30 and 31 in July.

The circuit court indicated agreement with the reasoning of the appeal tribunal and the commission, although the court summarized such reasoning as follows: "That under the terms of the contract any redesignation of a vacation period for shutdown purposes could *only* be made where the employees affected were given a sixty days' notice as required by the contract."

Both the commission and the circuit court considered that the strike and the resulting frustration of the employer's purpose in setting the vacation for weeks 30 and 31 in July gave the employer no excuse for failure to give sixty days' notice of the scheduling of vacations during the postponed shutdown in November because the employer could have provided for such contingency in the contract and failed to do so.

Apparently the commission and the circuit court reasoned that the contract did not prevent the employer, once it had given proper notice that it would shut down during a particular period and schedule vacations during that period, from postponing the shutdown period and rescheduling vacations during the postponed shutdown period. They reasoned, however, that after the period originally designated had passed by, if the employer then scheduled vacations for a later period of shutdown without giving a new sixty days' notice, the employees would have the right to insist that the

vacation pay be allocated retroactively to the period originally designated. They considered that this would be true even though the employees' absence from work during the originally designated period was caused by a strike.

We are unable to agree with the construction of the contract and addendum and the application of them made by the commission and the circuit court.

In the first place, the contract clearly contemplates that the vacation to which the employees are entitled is time off from work with pay as provided. There is to be no payment of the vacation allowance without absence from work unless the employer and employee so agree. Section 5 of Article IX of the contract, not quoted in the findings of fact, provides that, "All employees eligible for vacation shall be granted their vacation from work" although the employer may "arrange, with the consent of an employee, that such employee receive vacation allowance in lieu of actual vacation."

The employees involved in this action received payment of their vacation allowances with the notice sent out November 11th. The employer allocated the payment to weeks 47 or 48 or both. In order to establish a right to unemployment compensation benefits, the employees must show the right to have the payment allocated to some other period. As just noted, the contract does not give the employees the right, without the consent of the employer, to have the money allocated to any period while they were at work. They must show the right to have it allocated to a period of absence from work. No employee claimed the right to be absent from work in 1959 after week 48, and the only periods of absence from work to which the employees claimed these payments should have been allocated were weeks 30 and 31 in July during the strike.

We are unable to construe the contract and addendum in such a manner as to conclude that these employees were on

vacation during weeks 30 and 31. It is true that they were absent from work during those weeks, but their absence was due to the strike. Presumably in many if not all cases the absence was in support of the strike. The record does not suggest the contrary. It cannot be said that their absence from work during weeks 30 and 31 resulted from the vacation provisions of the contract nor from the employer's announcement of a shutdown. The applicable dictionary definition of "vacation" is given in Webster's New International Dictionary (3d ed., unabridged), as "a period of exemption from work granted to each employee of an industry or business: a leave of absence for rest and relaxation." Absence from work because of a strike does not meet the definition.

We are dealing, of course, with the intention of parties as expressed in an agreement. It would be possible for an agreement to provide expressly or by necessary implication that absence from work during a certain period was to be treated as a vacation even though the employee was absent in support of or because of a strike. For example, had the strike continued throughout 1959, this contract would have required the vacation pay to be allocated to a period during the strike because it clearly required scheduling of vacation prior to December 31st. It seems to us, however, that absence from work with leave of the employer or in exercise of contractual vacation rights is so different in nature from absence in support of or because of a strike that the contract should not be construed so as to compel the employer to treat absence during a strike as vacation unless the terms of the contract clearly require that result. We do not consider that the terms of the contract and addendum in this case clearly so require.

There was evidently some argument before the commission that because the employer had given a proper sixty-day

notice that vacations would be scheduled during weeks 30 and 31 in a shutdown, the contract and addendum prevented the employer from postponing those vacations. If this argument were sound, it would follow that at all times after the beginning of weeks 30 and 31 the vacation allowances were owed to the employees and allocable to those weeks, and the employees would prevail. There are, however, three reasons why this construction of the contract and addendum is not reasonable.

(1) Section 3 of Article IX of the contract exclusively reserved to the employer the final right to change allotments of vacation periods and it was recited that this reservation was made "in order to insure the orderly operation of the mine." This provision could as well authorize the employer to change a vacation schedule planned for a period of shutdown as a schedule of individual vacations in series.

(2) Such construction, if applied to these facts, would require the employer to treat absence because of a strike as vacation, and there is a fundamental difference between those concepts as ordinarily understood.

(3) The word "shutdown" in the addendum would ordinarily mean a cessation of operations at a time chosen by the employer. The strike caused a cessation of operations, it is true, but not at the choice of the employer in the same sense. In a sense an employer may be responsible for a strike because of failure or inability to reach agreement, but the timing of the strike and resulting cessation of operations was the choice of the union at least as much as the employer.

As has been noted, the theory of the commission and the circuit court was that the employer could, at least provisionally, postpone the vacation scheduled for weeks 30 and 31 after once giving the sixty-day notice but that such schedule continued to be a "previously established vacation schedule" and the employees could, under the provisions of

the addendum, choose retroactively to take their vacations during weeks 30 and 31 instead of during a shutdown in November for which they had received less than sixty days' notice. This reasoning contemplates that an employee could in November choose to "take his vacation" the preceding July. It does not give the words "take his vacation" their ordinary meaning.

Reading the contract together with the addendum, it seems that the parties contemplated two types of vacation schedules. Section 3 of Article IX contemplated a schedule of individual vacations spread out in series over a substantial period so that only a fraction of the employees would be away from work at any one time. Under section 3 such a schedule was to be tailored, as far as practicable, to the desires of the individual employees, preference being given to the choices of senior employees and the employer having the final word in order to insure orderly operation of the mine. The other type of schedule of vacations contemplated in the addendum is a plant-wide vacation or vacation during a period of shutdown. Section 3 of Article IX gave the employees the right to have their vacations scheduled in series. Once this schedule was formed, it became the established vacation schedule for that year. While the employer had the right under section 3 of Article IX to make changes in the individual vacations, it could not change the serial vacation schedules into a plant-wide vacation without giving sixty days' notice (presumably notice at least sixty days before the plant-wide vacation was to begin). Except for individual adjustments, an employee whose vacation schedule was established under section 3 had the right to take it accordingly unless he received a sixty days' notice that he was to be required to take it during a period of shutdown. According to the addendum, if the employer saw fit to order a shutdown and a plant-wide vacation without giving sixty days' notice,

the employees who had not yet taken their individually scheduled vacations could not be forced to change their plans.

We consider these provisions as having a prospective operation. In other words, if the employer failed to give sixty days' notice of a shutdown the employees would have a right to insist upon vacations at a later date in accordance with a previously established schedule, but the contract gave them no other relief. We do not read the addendum as providing that an employee who is directed on less than sixty days' notice to take his vacation within a shutdown period has a right to demand vacation pay in lieu of vacation (and to be laid off during the shutdown period) or a right to have his vacation pay allocated to some time in the past when he has happened to be away from work. His choice is simply stated to "take his vacation" in accordance with previously established schedules. Under these terms, the only employee in a position to make such choice would be one whose individually scheduled vacation period has not yet arrived when the employer first announces the shutdown without giving the required notice.

As observed by the commission and the court, there is no specific provision covering the procedure which must be followed when a change in circumstances makes it undesirable from the employer's point of view to have the vacation schedule and shutdown at a time for which the employer has given the proper notice. Much less is there an express provision as to what is to happen when a strike occurs at the time when vacations are scheduled. We find no reason, however, to construe the contract and addendum more strictly against the employer than the employees. As previously observed, a contract might be so drawn that it would clearly require a particular period to be treated as vacation regardless of the occurrence of a strike or the

frustration of the employer's purpose to ordering plant-wide vacations at that time. If so drawn, the lack of some express exception would be fatal to the employer's claim. We do not find such clarity in these documents.

We have assumed, as the commission and the circuit court concluded, that the scheduling of all vacations for 1959 was governed by the contract and addendum although the contract had expired before any of the vacations were taken. The parties have not argued to the contrary. If any terms of the injunction under which the employees returned to work during November and December affected this question, the parties did not see fit to make the injunction part of the record before us.

It is at least arguable under the terms of the contract and addendum, that once the employer had given sixty days' notice of its intent to schedule vacations during a shutdown period it had the right to postpone those schedules from time to time without giving a new sixty days' notice of the postponed vacation period, at least when it acted in good faith and not capriciously. If this argument were adopted, it would follow that the employer properly designated weeks 47 and 48 as vacation periods for these employees. There is no claim of bad faith or caprice.

Three members of the court, Mr. Justice CURRIE, Mr. Justice HALLOWS, and Mr. Justice DIETERICH, would decide the case on the proposition just stated. They rely upon the absence of any provision covering the particular situation which caused the employer to call off the shutdown period scheduled for weeks 30 and 31 and the principle, "that, unless a collective-bargaining agreement contains limitations upon the employer's discretionary right at common law in setting times for vacations, the employer has absolute discretion in establishing the time for vacation even though the

amount of pay and length of vacation be prescribed by such agreement." [2]

All members of the court, however, agree that even if the contract and addendum be construed to require a new sixty-day notice, as concluded by the commission and the court, it does not appear that any of the employees here had a vacation scheduled subsequent to weeks 47 and 48. Employees in that position would be the only ones able to exercise the option provided by the contract.

To summarize our conclusions: (1) The contract did not deprive the employer of the right to postpone vacations scheduled during shutdown once a sixty-day notice of a particular period had been given. (2) The contract may have permitted the employer to postpone vacations scheduled during shutdown from time to time without a new sixty days' notice. Three members of the court say that the contract did so permit. (3) If it did not so permit, the only employees in a position to claim a different vacation in the absence of a sixty days' notice would be those who at the time the insufficient notice was given had received an allotment of a later vacation time on a previously established schedule.

In our opinion, none of the employees who are claimants in this action established their right to a different allocation from the one made by the employer.

*By the Court.*—Judgment reversed; cause remanded with instructions to set aside the decision of the commission.

GORDON, J., took no part.

---

[2] *Cutler-Hammer, Inc., v. Industrial Comm.* (1961), 13 Wis. (2d) 618, 633, 109 N. W. (2d) 468.